FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 05 2024

TAMMY H. DOWNS, CLERK
By:_____ DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

MOSE WALKER                      PLAINTIFF

VS.      CASE NO. 2:24-cv-108-DPM

CHIEF ROBBIN A. CAMPBELL, JR.; AND,   This case assigned to District Judge **Marshall**
MAYOR MARCO MCCLENDON, each        and to Magistrate Judge **Volpe**
in their Individual and official capacities,
AND, THE CITY OF WEST MEMPHIS                     DEFENDANTS

## COMPLAINT

COMES NOW THE PLAINTIFF, **MOSE WALKER,** by and through counsel, **SUTTER & GILLHAM, P.L.L.C.,** who, for his Complaint, states:

### PARTIES AND JURISDICTION

1. Plaintiff is a citizen and resident of Crittenden County, who at all relevant times has been employed by Defendant, City of West Memphis, Arkansas, and almost all relevant events took place in Crittenden County, Arkansas.

2. Defendant, Robbin Campbell, is the Police Chief for the City of West Memphis, Arkansas. He is the Chief Law Enforcement Officer for the City of West Memphis and reports to and was appointed by the Mayor. Defendant, Marco McClendon, is the Mayor for the City of West Memphis, Arkansas. He is an elected official and is CEO of the City. Upon information and belief, both are citizens and residents of West Memphis, Arkansas. Defendant, City of West Memphis, Arkansas, is a municipal corporation organized under the laws of Arkansas, which substantially impacts interstate commerce.

3. This is an action brought under 42 U.S.C. 1983, Section 105 and 108 of the ACRA, and the Arkansas Whistleblower Act, in an amount exceeding that required for diversity

jurisdiction. The State law claims arise out of the same common nucleus of operative fact as the federal claims.

4. By virtue of the claims brought, there is personal jurisdiction, Federal question jurisdiction, and supplemental jurisdiction over the state law claims. Venue is proper.

## FACTS

5. Plaintiff began worked for the City of West Memphis in June of 2015 as a Police Officer.

6. At all times relevant, the City of West Memphis has employed more than 100 employees during more than twenty (20) weeks of the year.

7. Plaintiff, Walker, became Captain of CID in April of 2022.

8. In January of 2022, Defendant, Campbell, became Chief of Police.

9. During Campbell's years as Chief, he has created a culture of excessive force, police abuse, harassment, intimidation, coercion, and retaliation.

10. Defendant, Campbell's, damage to the Department starts at the beginning - in hiring - by requiring people to be hired who either do not meet the requirements of the job, or who have been rejected by command staff, and who he has admitted should not be hired. Lt. Gardner supervised the training division. The Chief did not like Gardner denying applicants who did not qualify. Gardner got suspended, and resigned feeling harassed by the Chief.

11. Then, Defendant, Campbell, interfered with their ability to get training.

12. Then, Defendant, Campbell, interfered with the supervision and discipline of these offers, turning a blind eye to, covering up, and lying about situations where excessive force has been used, officers have attempted to not provide medical care to gravely injured arrestees, officers have attempted to cover up those issues, and officers have been dishonest in carrying out

their law enforcement duties, and retaliating against officers who oppose or report these issues by disciplining them and having them investigated by internal affairs. Indeed, the Chief recently stated in a press conference not to bother with IA complaints, because he will not hear them.

13. Plaintiff, Walker, as part of command staff, was alarmed by these practices and tried to correct, stop, and prevent them. At first, and for a long time, this was by advising the Chief on how to handle these issues. His advice was not followed. But this was Walker's effort to apprise the City of these problems in time to correct them before they became public by contacting an appropriate authority. Major Allen's and Major Taylor's advice was also ignored.

14. Because Walker's advice was not followed, the problems in West Memphis began to escalate, such that merely giving advice was no longer enough. They began to permeate the department.

15. Meanwhile, in all areas of the City of West Memphis, Defendant, Mayor McClendon's, Administration has been marred by persistent discrimination and retaliation for whistle-blowing, complaints of discrimination, legally protected activities and speech, resulting in numerous lawsuits. The Mayor has been directly informed of these issues, tolerated the acts of those carrying them out, assisted in retaliation, and directed HR to help cover them up. The former HR director actively covered up these issues, allowed them to continue, and ignored them. This has resulted in numerous charges of discrimination and retaliation, and lawsuits.

16. This state of affairs has led to negative media coverage of the Police Department regarding use of force and lack of transparency, and its actions.

17. Plaintiff has spoken out as a citizen regarding illegal acts of the Chief to various persons and entities. He did not have to do this. He has opposed the Chief's efforts at cover-ups directly to him.

18. Several situations in particular provide good examples.

19. In one (1) situation, two (2) Police Officers jumped a citizen and kicked him while he was down. They arrested him and called a Patrol Officer to take him to jail. She could tell he was having trouble breathing and had been badly beaten and that he needed medical attention and refused the transport. He ended up going to the hospital and having broken ribs. So the force used was potentially deadly. The officers did not report their use of force appropriately, and then when questioned about the circumstances, they lied. The Chief resisted any investigation at all, and only relieved the officers of duty when Plaintiff, Captain Walker, and others insisted that the matter be investigated. Even then, the Chief did not open a formal investigation, never had the officers questioned, and they were brought back one (1) week later as though nothing had happened. They were never required to surrender their badges, guns, or other police equipment. However, there was an unofficial investigation where several people tried to find Skycop footage of the officers. Then, when an FOIA request was made, the Chief lied and said there was no investigation at all. During Walker's disciplinary hearing, the Chief stated that he decided not to forward the incident to the State Police because he felt it was nothing. Presumably, the arrestee's ribs broke themselves.

20. In another situation, an officer ran up on an arrestee who was cuffed, with hands behind his back, and not resisting. The officer kicked him in the head for no reason. This is potentially deadly force. In this case the Chief failed to investigate, failed to refer to an outside agency for investigation, and initially tried to cover up and fail to discipline. Only when the matter became public was the officer fired. But then the Chief rehired him knowing he was a danger to the public. Walker opposed these actions.

21. Meanwhile, one of Walker's subordinates was called in and questioned about whether Major Allen had been sexually harassing her. Major Allen has his own employment

lawsuit going against the city. She said that he had not, but then disclosed that another superior officer had been sexually harassing her. They were not interested in hearing about that, not even when she provided corroborating evidence of the harassment.

22. They came to her again. Once again they tried to get her to say Major Allen had harassed her. Once again she disclosed that another superior had been sexually harassing her, that she had evidence, and asked what was being done. They continued to do nothing. This is clearly an effort to retaliate against Allen for his lawsuit and a refusal to act on complaints.

23. So then she came to Captain Walker, who wrote a report and assisted her in taking the issue up the chain of command.

24. She did and nothing was done, but it became known as a result that Walker had helped her.

25. So, in December 2023, Chief Campbell had enough of Walker and put him on administrative leave during an investigation of him by IA. They threatened him with criminal liability during this time.

26. Supposedly, this investigation was because Walker had been doing something inappropriate by working at Wal Mart while on city hours during Monday nights throughout the period from October to December 2023.

27. Having off duty employment as security is generally permitted and it was known that Walker was doing it and he was given express permission to do so. Other senior officers on command staff had off-duty employment.

28. In October, a shift alteration occurred, transitioning his working hours from 8 am to 4 pm, to the new schedule of 4 pm until midnight, with an on-call commitment from midnight to 8 am, spanning Monday to Friday.

29. The shift modification had an impact on Walker specifically due to an ongoing security job commitment he held on Monday nights at Wal Mart, spanning from 5:30 pm to 1130 pm. Ceasing this commitment would have incurred financial losses for Walker. This was designed, one way or another, by the Chief to cause a loss for Walker, and for Major Allen, who is suing the city for discrimination. City personnel have said so.

30. Walker's job as a Captain primarily involves fielding requests from supervisors while offering guidance, as well as liaising with the administration. In instances of emergency, he is required to respond promptly. These duties can be effectively carried out whether stationed in a patrol car or any other location in the city, facilitated by the availability of communication tools such as radio devices, cell phones, internet services, and laptops.

31. So when he raised the issue, Walker was explicitly informed that attending to calls could be just as efficiently executed from Wal Mart as from the police station, and that he was allowed to keep his Monday evening commitment at the store while being vigilant to communications from his team and promptly attending to their requirements and any emergencies.

32. In other words, Walker was put on leave and investigated for doing something he was expressly told he could do.

33. One specific policy they alleged he violated was going AWOL. But that means that he is absent without permission. He was in the city, on-duty, responding to all calls, doing his paperwork, geared up and ready to respond on a moment's notice, inside the city, and his supervisors knew where he was, what he was, and had given permission.

34. The next policy he was alleged to have violated was "adherence to the law." The governing policy states that a charge or conviction for a criminal offense is required for the policy

to be violated. There were no charges, arrests, or convictions, and Defendants knew it - so why put him on leave and investigate him for that at all?

35. The next policy alleged as "personal conduct" but given that he was working at all times, and his supervisors permitted it, what is the problem.

36. Walker was put on leave for four months, with pay, but while on leave he could not work off duty, so he lost money.

37. The investigation and disciplinary process was violative of policies and procedures in numerous ways. Plaintiff's superior was supposed to be informed of the investigation and he was not. The investigation could not extend beyond 30 days without permission from the Chief, in writing, and a reason, and that did not happen. The Chief was not supposed to be involved in the investigation or interviews, and he was not interviewed for over a month. The Chief was told by the Assistant Chief that he was violating policy.

38. During this process, when Walker was finally called in he stated directly to the Chief that this behavior was illegal retaliation for various protected activities.

39. One reason Plaintiff gave was treatment of others. For example, a female officer engaged in misconduct by misusing ACIC/NCIC for personal reasons, which involved a colleague. Subsequently, she provided false information during an internal inquiry. Walker advocated for her termination due to her status as a detective as a Brady issue. The prosecutor's office has raised concerns about this. However, the Chief opposed the termination and imposed a 12-day suspension, relocating her to Southland for duty. The underlying issue remains - she retains her position as an officer, involved in criminal investigations and obligated to provide testimony. In another situation, a dispatcher altered the CAD. Walker brought proof of this to the Chief and Inspector to be investigated, and the matter was ignored.

40. Another example Plaintiff gave was : "the case of Michael Grant arose, where Grant accused the department's narcotics officers of beating him and causing severe internal injuries. Injuries that our local hospital could not remedy and he had to be transported to a Regional One Trauma Center in Memphis. All of which Grant made public in a news story by WREG Channel 3. Despite these claims being raised during a command staff gathering, the officers denied any misconduct. The lack of an appropriate use of force examination or internal investigation persists, allowing these officers to remain operational. Instead of doing as advised and having the incident investigated by the state, you spent your time telling these very same officers that two of your administrators wanted them arrested. A decision that sews discourse inside the department."

41. Another example Walker gave the Chief was: "Chad Rash aggressively kicked an unresisting suspect in the head, who was already subdued. That is deadly force. Rash was relieved from duty for a span of 1 to 2 months without undergoing any official use of force or internal affairs examination. The Chief initiated a scheme for a mere 10-day suspension with intentions to reinstate him. When a federal subpoena was received, he was dismissed. Rash was coerced to falsely sign documentation verifying a concluded investigation, which he rightfully declined because there was no investigation at all. Due to the Chief's assumption of things calming down, Rash was reinstated and continues to serve as an officer on active duty. Chad Rash aggressively kicked an unresisting suspect in the head, who was already subdued. That is deadly force. Rash was relieved from duty for a span of 1 to 2 months without undergoing any official use of force or internal affairs examination. The Chief initiated a scheme for a mere 10-day suspension with intentions to reinstate him. When a federal subpoena was received, he was dismissed. Rash was coerced to falsely sign documentation verifying a concluded investigation, which he rightfully

declined because there was no investigation at all. Due to the Chief's assumption of things calming down, Rash was reinstated and continues to serve as an officer on active duty."

42. Another example Plaintiff gave was that: "One of the female officers under my supervision was interrogated by Internal Affairs regarding potential sexual harassment by Major Allen, which she consistently denied. However, she later disclosed instances of sexual harassment by Captain Hall, substantiated by text exchanges. Surprisingly, no actions were taken. Subsequently, she was questioned again concerning Major Allen, to which she reiterated Hall's misconduct. It was revealed that an investigation was directed towards Allen, and covered up Hall's offenses. This matter was escalated through the chain of command and finally to HR, yet no resolutions have been pursued or corrective actions taken."

43. When Walker read his letter to the Chief, the Chief became very angry. He then claimed that Walker committed the following policy violations, AWOL, Personal Conduct, Neglect of duty, and Courtesy to Supervisor, and recommended termination, which is a threat. Furthermore, the Chief knew Walker was doing what he did with permission, the additional violations being added violated policy, and the issue of courtesy was simply false and referred to Walker's respectful exercise of First Amendment speech rights.

44. The Mayor and HR were informed of these allegations, and Walker's suspension was continued. Finally, they decided to suspend Walker for 20 days and demote him to Sergeant, causing him to lose pay. Furthermore, he is now at risk if he attempts to work off duty, so he has lost a benefit of the job in that he cannot afford to do off duty work at all now. At the end of his suspension, with almost no notice, Walker was informed he was being moved from CID to Graceland, a less prestigious job, with a different shift, which caused difficulty in obtaining child care. In this position he is supervising only one officer, and for some reason, she, the subordinate

officer has the day shift, while Walker has the less desirable night shift. Walker was now put under the Captain who he had forwarded a sexual harassment claim up the chain of command on. Finally, Plaintiff has a medical condition which requires surgery. The job of CID Captain is less onerous physically, mostly being office work, whereas as a Sergeant, supervising only one person on a different shift, Walker is essentially a street cop with more physically onerous duties. Accordingly, Walker has been forced to take medical leave pending his surgery, which otherwise would not have been necessary.

45. Furthermore, two (2) Senior Officers were found to have committed acts like truthfulness, insubordination, personal conduct, and violation of a direct order under Campbell and were not demoted. During the pendency of the investigation, Sgt. Matthew Jarrett was on dash cam video grabbing an arrestee around the neck, even though he was cuffed and already in the back seat. The Mayor's Chief of Staff is a felon who was convicted of bribery as a public official to get two companies to receive more than $125 million in government funds. But Plaintiff, Mose Walker, was falsely accused and demoted.

46. Formal complaints have been made about this kind of conduct from the Chief, but nothing is done.

47. Plaintiff has filed an EEOC charge concerning his suspension, administrative leave, loss of benefits, and demotion and will amend to add Title VII claims when a right to sue letter is issued.

## COUNT I

47. Plaintiff restates the foregoing as if fully stated herein.

48. By virtue of the facts alleged herein, Plaintiff has spoken out on matters of public concern, as a citizen, and has been retaliated against in violation of his U.S. and Arkansas Constitutional rights, in violation of 42 U.S.C. 1983 and ACRA Section 105.

49. By virtue of the facts alleged herein, Plaintiff has suffered lost wages and benefits, lost earning capacity, mental, emotional, and physical suffering and damage to his reputation.

50. The individual capacity Defendants' actions have been in willful, intentional, and reckless violation of Plaintiff's rights, meriting an award of punitive damages.

## COUNT II

51. Plaintiff restates the foregoing as if fully stated herein.

52. By virtue of the facts alleged herein, Plaintiff has opposed illegal conduct, borne witness to illegal conduct, and participated in investigations of illegal conduct. He is a public employee and the City is a public employer. He has been retaliated against on account of protected activity.

53. By virtue of the facts alleged herein, Plaintiff has suffered lost wages and benefits, and lost earning capacity,.

## COUNT III

54. Plaintiff restates the foregoing as if fully stated herein.

55. By virtue of the facts alleged herein, Plaintiff has opposed sexual harassment and discrimination, supported a victim, and reported and witnessed to this behavior. He has been retaliated against for this in violation of Ark. Code Ann. 16-123-108.

56. By virtue of the facts alleged herein, Plaintiff has suffered lost wages and benefits, lost earning capacity, mental, emotional, and physical suffering and damage to his reputation.

57.     The individual capacity Defendants' actions have been in willful, intentional, and reckless violation of Plaintiff's rights, meriting an award of punitive damages.

## JURY DEMAND

58.     Plaintiff demands a trial by jury.

## PRAYER

**WHEREFORE**, Plaintiff, **MOSE WALKER,** prays for the following relief, backpay, front pay or reinstatement, compensatory damages, punitive damages, all in an amount exceeding that required for diversity jurisdiction, declaratory and injunctive relief, including, but not limited to, cleansing of Plaintiff's file, an apology, a positive reference, designation as rehirable, training for the Chief, and 800#, a monitor, posting of this verdict at the workplace, reasonable fees and costs, a jury trial on all matters so triable, and all other appropriate relief.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
1501 N. Pierce, Ste. 105
Little Rock, AR 72207
501-315-1910 Office
501-315-1916 Facsimile
*Attorneys for the Plaintiff*

By:     */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar No. 95031
Luthersutter.law@gmail.com

By:     */s/ Lucien R. Gillham*
Lucien R. Gillham, Esq. ARBN 99-199
lucien.gillham@gmail.com